1     (Eddie) Jae K. Kim (SBN: 236805)
      ekim@lcllp.com
2     **LYNCH CARPENTER, LLP**
      117 E Colorado Blvd, Ste 600
3     Pasadena, CA 91105-3712
      Telephone: (213) 723-0707
4     Facsimile: (858) 313-1850

5     *Attorney for Plaintiff*

6     *Additional Counsel Listed in Signature Block*

7

8               **UNITED STATES DISTRICT COURT**

9               **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| William Glenn Johnson, individually and on behalf of all others similarly situated,<br>           Plaintiff,<br><br>    v.<br><br>EPISOURCE, LLC,<br><br>           Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1. Negligence<br>2. Negligence *per se*<br>3. Unjust Enrichment<br>4. Declaratory Judgment<br><br>**DEMAND FOR JURY TRIAL** |

      Plaintiff William Glenn Johnson ("Plaintiff"), by and through the undersigned counsel, files this Class Action Complaint individually and on behalf of a class of all similarly situated persons ("Class Members") against Defendant Episource, LLC ("Episource" or "Defendant"). Plaintiff bases the following allegations upon information and belief, investigation of counsel, and his own personal knowledge.

## I.     NATURE OF THE CASE

      1.     Defendant failed to properly secure and protect the sensitive and valuable personal identifying information ("PII") and protected health information ("PHI") of numerous people, such as individuals' names, addresses, phone numbers, and emails. More critical, however, Defendant's failure caused the disclosure of (a) health insurance data including insurance plans/policies, insurance companies, member and group ID numbers, and government insurance payor ID numbers; (b) health information such as

medical records showing the identification of doctors, diagnoses, medication, test results, imaging, care, and treatments; and (c) other personal data such as Social Security Numbers and dates of birth.[1] Plaintiff, and the other members of the proposed class, were harmed by this disclosure.

2.    Companies that provide healthcare and the associated businesses that work with such providers hold sensitive PII and PHI for patients. Those businesses owe a duty to those patients whose data the companies possess. This is because the extreme harm which will result to individuals if their PII and PHI is released to unauthorized third parties is foreseeable. Today the risk of hackers exfiltrating such information is well known and must be managed.

3.    Individuals whose information is compromised in data privacy leaks are harmed in many ways, including identify theft and financial or medical fraud. These individuals face a real risk that they will be the victim of identity theft which is multitudes greater than the general public. Victims of data breaches must spend much more time and money to try to mitigate their risk. They can do so by monitoring their credit, bank accounts, health records, and email while taking additional affirmative measures such as changing passwords and paying for monitoring services.

4.    Episource provides medical coding, risk adjustment services, and software solutions for healthcare providers and health plans.[2]

5.    As part of its business, Defendant's customers indirectly or directly entrust it with individuals' PII and PHI. As a sophisticated technology company, Defendant was aware that the PII and PHI it held was a valuable target for cybercriminals who would seek to obtain the information for illegal purposes. When this information falls into the hands of such thieves, they can wreak havoc for all of the individuals, which has happened here.

---

[1] *Notice of Data Breach*, https://response.idx.us/episource/ (last visited July 1, 2025).
[2] *About Us*, Episource, (last visited July 1, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

6.      Defendant collected and stored individuals' PII and PHI and therefore assumed a duty to protect and secure that data against unauthorized access and disclosure by using reasonable and adequate security measures. Defendant knew at all times that the PII and PHI it held was valuable and a foreseeable target for a cyberattack.

7.      Despite this duty to protect the PII and PHI in its possession, and knowing the likelihood of a potential breach, Plaintiff's and the other Class Members' PII and PHI was accessed and stolen by unauthorized third parties between January 27, 2025 and February 6, 2025 (the "Data Breach").[3] The Data Breach resulted in the unauthorized disclosure of the PII and PHI of over 5.4 million individuals.[4]

8.      These thieves now have Plaintiff's and the Class Members' PII and PHI as a direct and proximate result of Defendant's failure to follow basic security procedures. All Class Members, including Plaintiff, now face a significantly increased and certainly impending risk of fraud, identify theft, misappropriation of health insurance benefits, intrusion of their health privacy, and additional criminal acts. These risks may last the Class Members' entire lives. Because of this, Plaintiff and the Class Members must spend significantly more time, money, and attention to mitigate the actual harm of these actions.

9.      Plaintiff, on behalf of himself and the Class as defined herein, brings claims for negligence, negligence *per se*, unjust enrichment, and declaratory judgment, seeking damages, with attorneys' fees, costs, and expenses, and appropriate injunctive and declaratory relief.

10.     To redress these injuries, Plaintiff and the Class Members seek damages in an amount to be determined at trial, declaratory judgment, and injunctive relief requiring Defendant to: (1) investigate and disclose, expeditiously, the full nature of the Data Breach and the types of PII and PHI accessed, obtained, or exposed by the hackers; (2) implement improved data security practices to reasonably guard against future breaches

---

[3] *Notice of Data Breach*, *supra* n.1.

[4] OCR Breach Portal, HHS, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited June 20, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

of PII and PHI possessed by Defendant; and (3) provide, at Defendant's own expense, all impacted victims with lifetime identity protection services.

## II.    PARTIES

11.    Plaintiff William Glenn Johson is an adult who, at all relevant times, is and was a citizen of the State of California.

12.    Defendant Episoure, LLC is a California limited liability company with a principal place of business located at 500 West 190th Street, Suite #400, Gardena, California 90248.[5]

## III.    JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interests and costs, there are more than 100 proposed Class Members, and minimal diversity exists as Defendant is a citizen of states different from that of at least one Class Member.

14.    This Court has personal jurisdiction over Defendant because Defendant's principal place of business is located in the State of California.

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as Defendant resides in this District; a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District; and Defendant conducts substantial business within this District.

---

[5] When subject matter jurisdiction is established under the Class Action Fairness Act, "an LLC's citizenship is based on its principal place of business and laws of incorporation." *Hernandez v. Pure Health Rsch. LLC*, No. 23-cv-00971, 2023 2023 WL 7029213 (S.D. Cal. Oct. 25, 2023) (applying § 1332(d)(10) of CAFA) (citing *Jack v. Ring LLC*, 553 F. Supp. 3d 711, 715 (N.D. Cal. 2021)); *see also Abrego v. Dow Chem. Co.*, 443 F.3d 676, 684 (9th Cir. 2006) (noting that § 1332(d)(10) of CAFA provides a different rule for unincorporated associations). Here, Defendant is an LLC formed under the laws of California and with its principal place of business in California. Thus, for the purposes of establishing minimal diversity, Defendant is a citizen of California.

4

# IV. FACTUAL BACKGROUND

**A. Defendant Collected and Stored Plaintiff's and Class Members' PII and PHI.**

16.    Defendant is a provider of medical coding, risk adjustment services, and software solutions for healthcare providers and insurers. Defendant employs over 8,000 coders, engineers, and analysts who code over 24 million records annually. Its mission "is to continually advance our accuracy, efficiency, and expertise so that we can achieve the best possible outcomes for our clients, their members, and their patients."[6]

17.    Upon information and belief, through its day-to-day operations, Defendant receives, creates, maintains, and handles individuals' PII and PHI. This information includes individuals' names, addresses, phone numbers; health insurance data such as health plans/policies, insurance companies, member/group ID numbers, and Medicaid-Medicare-government payor ID numbers; health data such as medical record numbers, doctors, diagnoses, medicines, test results, images, care, and treatment; and other personal data such as Social Security numbers or dates of birth.

18.    Plaintiff and Class Members directly or indirectly gave Defendant their sensitive PII and PHI and reasonably expected that Defendant would safeguard their highly sensitive PII and keep their PHI confidential.

19.    Due to the sensitivity of the PII and PHI that Defendant handles, collects, and stores, it is or should have been aware of its critical responsibility to safeguard this information and how harmful its theft is to Plaintiff and the Class Members.

20.    By requesting, obtaining, collecting, storing, and deriving a benefit from Plaintiff's and Class Members' PII and PHI, Defendant assumed equitable and legal duties to safeguard and keep confidential Plaintiff's and Class Members' highly sensitive information, to only use this information for authorized business purposes, and to only make authorized disclosures.

---

[6] *About Us*, *supra* n 2.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

21.    Defendant acknowledged to Plaintiff and the Class Members that "Each time a client shares their data with us, they're placing their utmost trust in us to keep that information safe . . . we are committed to ensuring all of our solutions and services meet the regulatory requirements set by the risk adjustment and healthcare industries."[7]

22.    Despite these clear duties, Defendant failed to implement reasonable data security measures to protect Plaintiff's and Class Members' PII and PHI, and ultimately allowed unauthorized third parties to access and compromise Plaintiff's and Class Members' PII and PHI.

**B.    Defendant is Subject to HIPAA as a Business Associate.**

23.    The Health Insurance Portability and Accountability Act ("HIPAA") establishes security provisions and data privacy responsibilities designed to keep individuals' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of PHI.[8]

24.    HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PHI is properly maintained.[9]

25.    HIPAA applies to (1) "covered entities," such as a health care provider, a health plan, or healthcare clearinghouse; and (2) "business associates" who are engaged by covered entities to help it carry out its healthcare activities. *See* 45 C.F.R. § 160.103.

26.    Upon information and belief, Defendant falls into the second category (as a "business associate") that is subject to HIPAA, because it receives, maintains, and

---

[7] *Id.*

[8] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, phone numbers, addresses, any dates relating to an individual (including dates of birth), Social Security numbers, and medical record numbers.

[9] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

electronically transmits PHI as part of its services that includes medical coding, risk adjustment services, and software solutions for healthcare providers and health plans.

27.     Indeed, whenever Defendant contracts with Covered Entities to provide various business and medical services, HIPAA requires that these contracts mandate that Defendant will use adequate safeguards to prevent unauthorized use or disclosure of PHI, including by implementing the HIPAA Security Rule[10] and immediately reporting any unauthorized use or disclosure of PHI (such as the Data Breach) to affected Covered Entities.

28.     Defendant explicitly recognizes this duty. Defendant claims that it is "committed to ensuring all of our solutions and services meet the regulatory requirements set by the risk adjustment and healthcare industries. We are HITRUST CSF Certified, ISO 27001 Certified, and NIST Certified."[11]

29.     Nevertheless, Defendant employed inadequate data security measures to protect and secure the Plaintiff's and the Class Members' highly valuable and confidential information, resulting in the Data Breach and subsequent compromise of Plaintiff's and Class Members' PHI.

30.     By requesting, obtaining, collecting, storing, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PHI from unauthorized disclosure.

31.     Further, given the application of HIPAA, and that Plaintiff and Class Members directly or indirectly entrusted their PHI to Defendant in order to use their services, Plaintiff and Class Members reasonably expected that Defendant would safeguard their highly sensitive information and keep their PHI confidential.

---

[10] The HIPAA Security Rule establishes national standards to protect individuals' electronic personal health information that is created, received, used, or maintained by a covered entity. The Security Rule requires appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information. *See* 45 C.F.R. Part 160 and Part 164, Subparts A and C.

[11] *About Us*, *supra* n.2.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

### C.   The Risks of Storing Valuable PII and PHI Are Well-Known in the Healthcare Industry

32.    As a sophisticated business which handles voluminous patient data, Defendant knew at all relevant times that the PII and PHI that it obtains, collects, stores, uses, and derives a benefit from is highly sensitive and valuable to cybercriminals.

33.    Defendant also knew that a breach of its computer systems, and the resulting exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII and PHI were compromised, as well as intrusion into their highly private health information.

34.    These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at healthcare partner and provider companies, including NextGen Healthcare, Inc. (1.5 million patients, April 2023); OneTouchPoint, Inc. (4.1 million patients, July 2022), Shields Healthcare Group (2 million patients, March 2022), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020). These breaches put Defendant on notice that its electronic records would be targeted by cybercriminals.

35.    PII is a valuable commodity for cybercriminals. These individuals routinely sell this information on shady and nefarious corners of the internet. Recently there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[12] For PHI, besides the pervasive and intrusive harm resulting from the disclosure of private health information, can be used for medical fraud and to submit false medical claims for reimbursement.

---

[12] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

36.     Data breaches have rapidly grown in frequency in recent years. In 2024, there were 6,670 recorded data breach incidents, exposing over 16.8 billow records. The United States specifically saw a 12% year-over-year increase in data breaches as compared to 2023.[13] Further, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, approximately 2.675 million people reported some form of identity fraud compared to approximately 6.5 million people in 2024.[14] Concomitant with these breaches and theft, and the massive economic losses of the individuals, businesses, and government entities resulting from those incidents have rapidly grown.

37.     The healthcare industry, specifically, has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[15] Indeed, "[t]he IT environments of healthcare organizations are often complex and difficult to secure. Devices and software continue to be used that have reached end-of-life, as upgrading is costly and often problematic. Many healthcare providers use software solutions that have been developed to work on specific—and now obsolete—operating systems and cannot be transferred to supported operating systems."[16]

38.     Cybercriminals seek out PHI at a greater rate than other sources of personal information. Between 2009 and 2024, 6,759 healthcare data breaches of 500 or more individuals have been reported to Health and Human Services' Office of Civil Rights.

---

[13] *2025 Global Threat Intelligence Report*, Flashpoint, https://go.flashpoint.io/2025_GTIR.

[14] *Insurance Information Institute, Facts & Statistics: Identity Theft and Cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%20 2015-2019%20 (last visited June 20, 2025); https://www.iii.org/graph-archive/96074 (last visited July 2, 2025).

[15] *The Healthcare Industry is at Risk*, SwivelSecure https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited July 2, 2025).

[16] Steve Alder, Editorial: *Why Do Criminals Target Medical Records*, HIPAA Journal (Oct. 14, 2022), https://www.hipaajournal.com/why-do-criminals-target-medical-records.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Those breaches have resulted in the exposure of 846,962,011 healthcare records, dwarfing the number of people in the United States.[17]

39.    In fact, "[a]n unwanted record was set in 2023 with 725 large security breaches in healthcare reported to the Department of Health and Human Services Office for Civil Rights, beating the record of 720 healthcare security breaches set the previous year."[18] In 2023 alone, about one-third of Americans were affected by health-related data breaches.[19]

40.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to medical fraud, identity theft, tax fraud, credit fraud, bank fraud, and more.

41.    **Social Security Numbers**—while credit or debit card numbers can quickly be frozen and reissued in the aftermath of a breach, unique social security numbers cannot be easily replaced. While an individual can replace their Social Security Number, the process is markedly more onerous and takes far more time. Such a change requires a complete overhaul of the individual's information with government agencies and any companies that require this information like banks and employers. Even this drastic step cannot mitigate the harm completely, and may cause even more issues. The Social Security Administration warns:

> [G]overnmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same. . . . For some victims of identity theft, a new number actually creates new

[17] Steve Alder, *Healthcare Data Breach Statistics*, HIPAA Journal (May 26, 2025), https://www.hipaajournal.com/healthcare-data-breach-statistics/.

[18] Steve Alder, *Security Breaches in Healthcare in 2023*, The HIPAA Journal (January 31, 2024), https://www.hipaajournal.com/wp-content/uploads/2024/01/Security_Breaches_In_Healthcare_in_2023_by_The_HIPAA_Journal.pdf.

[19] Ken Alltucker, *Health Care Data Breaches Hit 1 in 3 Americans Last Year: Is Your Data Vulnerable?*, USA Today (Feb. 19, 2024), https://www.usatoday.com/story/news/health/2024/02/18/health-data-breaches-hit-new-record-2023/72507651007/.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[20]

42.     Individuals use their Social Security Number to apply for credit cards, student loans, mortgages, and other lines of credit. Social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Stealing Social Security Numbers gives criminals the ability to fraudulently secure these funds and benefits at the expense of the victims.

43.     Healthcare Records—The value of PHI records exceeds the value of an individual's credit card number because they give criminals the names of patients, dates of birth, Social Security Numbers, insurance information, and bank information. Jim Trainor, former second in command at the FBI's cyber security division reported : "Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[21] Purchasing a complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[22]

44.     Medical records "can be used to commit a multitude of crimes. Healthcare data can be used to impersonate patients to obtain expensive medical services, Medicare and Medicaid benefits, healthcare devices, and prescription medications. Healthcare records also contain the necessary information to allow fraudulent tax returns to be filed to obtain rebates."[23] Credit cards expire and bank accounts can close or be frozen. However, healthcare data "has an incredibly long lifespan and can often be misused for

---

[20] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[21] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[22] *Managing Cyber Risks in an Interconnected World, Key Findings from The Global State of Information Security® Survey 2015*, PriceWaterhouseCoopers, https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf (last visited June 20, 2025).

[23] *Security Breaches in Healthcare in 2023*, *supra* n. 18.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

long periods undetected. Credit card companies monitor for fraud and rapidly block cards and accounts if suspicious activity is detected, but misuse of healthcare data is harder to identify and can be misused in many ways before any malicious activity is detected. During that time, criminals can run up huge debts – far more than is usually possible with stolen credit card information."[24]

45.    According to Experian, stealing healthcare information allows thieves to "open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details." [25] Victims of regular data breaches average spending $600, according to the FTC, to mitigate the damage of such a breach. However, according to the Ponemon Instiute, healthcare identify theft force victims to spend "$13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills."[26] Theft of healthcare records could result in someone's insurance company denying care and coverage, or cancelling their policies altogether.[27] The social and personal impact on victims can also include "threat[s of] losing custody of their children, been charged with drug trafficking, [finding] it hard to get hired for a job, or even be[ing] fired by their employers."[28]

46.    Sometimes, identify thieves are able to match partial PII and PHI with other sources, like purchasing multiple sets of information from different breaches, and create even more complete profiles of victims called "Fullz" packages. These Fullz packages allow criminals to gather victims' phone numbers, email addresses, and other unregulated sources and identifiers. Thieves can then sell these more complete Fullz profiles for higher values. With these dossiers, thieves can commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take overs, medical

---

[24] *Id.*

[25] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

[26] *Id.*

[27] *Id.*

[28] *Id.*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

identity fraud, tax refund fraud, and buy now pay later frauds.[29] Critically, cybercriminals in possession of a Fullz package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[30]

47.    Defendant knew the value of the PII and PHI it held, and the foreseeability of a data breach, and the importance of safeguarding the information. But Defendant failed to take adequate cybersecurity measures to prevent the Data Breach from occurring.

### D.    Defendant Breached Its Duty to Protect PII and PHI

48.    On February 6, 2025, Defendant discovered unusual activity in its computer systems. While investigating the disruption, Defendant discovered that a cybercriminal was able access and steal data stored in its computer systems between January 27, 2025 to February 6, 2025.[31]

49.    On April 23, 2025, Defendant began notifying its customers about which individuals and specific data may have been involved in the Data Breach.[32]

50.    Defendant disclosed that a wide variety of patient PII and PHI was compromised in the Data Breach, such as individuals' names, addresses, phone numbers and emails as well as one or more of the following: (a) health insurance data such as health plans/policies, insurance companies, member/group ID numbers, and Medicaid-Medicare-government payor ID numbers; (b) health data such as medical record numbers, doctors, diagnoses, medicines, test results, images, care, and treatment; and (c) other personal data such as Social Security number or date of birth.

---

[29] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME (Mar. 3, 2024), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.

[30] *Protection Against Fullz and Fraud*, INTEGRITY (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.

[31] *Notice of Data Breach*, *supra* n. 1.

[32] *Id.*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

51.    Defendant later reported the Data Breach to the Department of Health and Human Services Office for Civil Rights, indicating that the PII and PHI of 5,418,866 individuals were affected by the Data Breach.[33]

52.    Based on Defendant's own statements, cybercriminals intentionally accessed Defendant's computer systems in an attack designed to access Plaintiff's and Class Members' valuable PII and PHI stored therein, and that these malicious actors were successful in the attack.

53.    As a direct and proximate result of Defendant's failure to implement and maintain adequate security measures the PII and PHI of more than 5.4 million individuals—including Plaintiff and Class Members—was accessed and compromised by thieves during the Data Breach. Furthermore, it will be nearly impossible for Plaintiff and the Class to reinsure that their stolen PII and PHI has been secured.

**E.    Defendant Is Obligated Under HIPAA to Safeguard PHI**

54.    As discussed above, Defendant is a business associate and is required by HIPAA to safeguard PHI.

55.    Defendant is required by HIPAA, 42 U.S.C. § 1320d et seq. to safeguard patient health information data and health information transactions.

56.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

57.    Under 45 C.F.R. § 160.103, HIPAA defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media"; "[m]aintained in electronic media"; or "[t]ransmitted or maintained in any other form or medium."

58.    Under 45 C.F.R. § 160.103, HIPAA defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care

[33] OCR Breach Portal, *supra* n. 4.

provider;" (2)"[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) "identifies the individual"; or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual."

59.   HIPAA requires Defendant to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI they create, receive, maintain, or transmit; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by their workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, et seq.

60.   The Department of Health and Human Services Office for Civil Rights recommends the following data security measures that covered entities and business associates like Defendant should implement to protect against some of the more common, and often successful, cyber-attack techniques:

  a.   Regulated entities should implement security awareness and training for all workforce members and that the training programs should be ongoing, and evolving to be flexible to educate the workforce on new and current cybersecurity treats and how to respond;

  b.   Regulated entities should implement technologies that examine and verify that received emails do not originate from known malicious sites, scan web links or attachments included in emails for potential threats, and impeded or deny the introduction of malware that may attempt to access PHI;

  c.   Regulated entities should mitigate known data security vulnerabilities by patching or upgrading vulnerable technology infrastructure, by upgrading or replacing obsolete and/or unsupported applications and devices, or by implementing safeguards to mitigate known vulnerabilities until an upgrade or replacement can occur;

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

    d.    Regulated entities should implement security management processes to prevent, detect, contain, and correct security violations, including conducting risk assessments to identify potential risks and vulnerabilities to the confidentiality, integrity, and availability of PHI; and

    e.    Regulated entities should implement strong cyber security practices by requiring strong passwords rules and multifactor identification.[34]

61.    Upon information and belief, Defendant failed to implement one or more of the above recommended data security measures.

62.    While HIPAA permits covered entities to disclose PHI to third parties under certain circumstances, HIPAA does not permit covered entities to disclose PHI to cybercriminals, nor did Plaintiff or Class Members consent to the disclosure of their PHI to cybercriminals.

63.    As such, Defendant is required under HIPAA to maintain the strictest confidentiality of Plaintiff's and Class Members' PHI that it acquires, receives, and collects, and Defendant is further required to maintain sufficient safeguards to protect that information from being accessed by unauthorized third parties.

64.    Given the application of HIPAA to Defendant, and that Plaintiff and Class Members directly or indirectly entrusted their PHI to Defendant, Plaintiff and Class Members reasonably expected that Defendant would safeguard their highly sensitive information and keep their PHI confidential.

**F.    Defendant Failed to Comply with FTC Guidelines**

65.    Defendant is prohibited by the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45 from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

---

[34] *OCR Quarter 1 2022 Cybersecurity Newsletter*, U.S. Dep't Health & Human Services, (Mar. 17, 2022), https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity-newsletter-first-quarter-2022/index.html.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

66.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[35]

67.     In 2016, the FTC updated its publication titled Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.[36] The guidelines recommend that businesses implement the following:

a.      Businesses should promptly dispose of personal identifiable information that is no longer needed, and retain sensitive data "only as long as you have a business reason to have it;"

b.      Businesses should encrypt sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

c.      Businesses should thoroughly understand the types of vulnerabilities on their network and how to address those vulnerabilities;

d.      Businesses should install intrusion detection systems to promptly expose security breaches when they occur; and,

e.      Businesses should install monitoring mechanisms to watch for large troves of data being transmitted from their systems.[37]

68.     In another publication, the FTC recommended that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for

---

[35] See Federal Trade Commission, *Start with Security: A Guide for Business* (June 2015), available at: https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business.

[36] See Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (Oct. 2016), available at: https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

[37] *Id.*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[38]

69.    Notably, the FTC treats the failure to employ reasonable data security safeguards as an unfair act or practice prohibited by Section 5 of the FTC Act. Indeed, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

70.    Upon information and belief, Defendant failed to properly implement one or more of the basic data security practices recommended by the FTC. Defendant's failure to employ reasonable and appropriate data security measures to protect against unauthorized access to individuals' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

71.    Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[39]

72.    NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network

---

[38] *See Start with Security: A Guide for Business*, Federal Trade Commission (June 2015), available at https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business.

[39] *See Framework for Improving Critical Infrastructure Cybersecurity*, National Institute of Standards & Technology (Apr. 16, 2018), App'x A, Table 2, available at https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

monitoring, breach detection, and incident response.[40] Upon information and belief, Defendant failed to adhere to the NIST guidance.

73.    Further, cybersecurity experts have identified various best practices that should be implemented by entities in the healthcare sector, including implementing the following measures to defend against common cyberattacks:

        a.    Email protection systems and controls;

        b.    Endpoint protection systems;

        c.    Identify all users and audit their access to data, application, systems, and endpoints;

        d.    Data protection and loss prevention measures;

        e.    IT asset management;

        f.    Network management;

        g.    Vulnerability management;

        h.    Security operations center & incident response; and,

        i.    Cybersecurity oversight and governance policies, procedures, and processes.[41]

74.    Upon information and belief, Defendant failed to protect massive amounts of PII and PHI because it did not adopt reasonable safeguards as required by the FTC guidelines, NIST guidance, and industry best practices.

75.    Defendant understood its obligations to use reasonable measures to protect individuals' PII and PHI, and that this information was a prime target for criminals. Despite understanding these risks and the foreseeable harms that would occur as a result, Defendant nevertheless failed to comply with its data security obligations, leading to the compromise of Plaintiff's and Class Members' PII and PHI.

---

[40] *Id*. at Table 2, 26-43.
[41] *HICP's 10 Mitigating Practices*, HHS, https://405d.hhs.gov/best-practices (last visited June 20, 2025).

### G.    Plaintiff and Class Members Suffered Damages

76.    For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways. Plaintiff and members of the Class must immediately devote time, energy, and money to: (1) closely monitor their medical statements, bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or phishing attacks; and (4) search for suitable identity theft protection and credit monitoring services, and procure them.

77.    Plaintiff and the Class Members have almost no way to ensure their PII and PHI is fully recovered or secured against future misuse. Plaintiff and Class Members are now forced to implement extreme monitoring procedures for years, all because of Defendant's failures. Additionally, Plaintiff and the Class Members have lost significant value in their PII and PHI because of its exposure.

78.    As a result of Defendant's failures, Plaintiff and Class Members are also at a substantially increased risk of identity theft, fraud, phishing attacks, and related cybercrimes because of the Data Breach. Those impacted are under heightened and prolonged anxiety and fear, because they are at an elevated risk of being targeted in cybercrimes in the future.

79.    With respect to data breaches specifically in the healthcare sector, a study has found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[42] Threat actors buy and sell PII and PHI from healthcare providres and institutions on the internet regularly and the effect will be permanent, because the data remains useful to such criminals in

---

[42] Jessica David, *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, Health IT Sec. (Sept. 25, 2019), https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

committing identify theft, financial fraud, and phishing attacks.[43] Cybercriminals universally use this information for criminal activities and the "stolen health data can be used to carry out a variety of crimes."[44] Leaked PII and PHI allows criminal to leverage personal health details and diagnoses to extort or coerce someone, and commit long-term identity theft.[45]

80. "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[46]

81. Indeed, many victims of medical identity theft are not aware of the theft until long after it occurs; "[s]omeone may apply for a mortgage, for example, and learn their credit is ruined due to unpaid medical bills for care they didn't receive."[47]

82. Because Defendant's systems have been shown to be susceptible to data breaches, Plaintiff and Class Members are at a continued risk while their PII and PHI remain in Defendant's systems. While Defendant continues to fail to undertake the necessary and appropriate security and training measures to protect PII and PHI, Plaintiff and the Class Members are subject to further attack on the data they entrusted to Defendant.

83. Additionally, Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers.

---

[43] *Id.*

[44] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HealthTech (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

[45] *Id.*

[46] *The Potential Damages & Consequences of Medical Identity Theft & Healthcare Data Breaches*, Experian (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

[47] Michelle Andrews, *Someone Could Steal Your Medical Records and Bill You for Their Care*, NPR (July 26, 2023), https://www.npr.org/sections/health-shots/2023/07/26/1189831369/medical-identity-fraud-protect-yourself.

### H.   Plaintiff's Experience

84.    Upon information and belief, Plaintiff receives healthcare from a healthcare provider who, upon information and belief, utilizes Defendant's services. Plaintiff provided his PII and PHI, directly or indirectly, to Episource in order to receive medical care. In requesting, obtaining, collecting, storing, using, and deriving a benefit from Plaintiff's PII and PHI, Defendant undertook a duty to act reasonably in their handling of Plaintiff's PII and PHI. Defendant, however, did not take reasonable care of Plaintiff's PII and PHI, leading to their exposure and compromise as a direct and proximate result of Defendant's inadequate security measures.

85.    Plaintiff received notice from Defendant informing him that his PII and PHI entrusted to Episource was compromised in the Data Breach.

86.    As a direct and proximate result of the Data Breach, Plaintiff has suffered actual injury from having his PII and PHI exposed and/or stolen as a result of the Data Breach, including: (a) efforts to mitigate the risk of misuse of his PII and PHI; (b) damages to and diminution of the value of his PII and PHI, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (c) loss of privacy.

87.    Further, knowing that hackers accessed and possibly exfiltrated Plaintiff's PII and PHI, and that this information likely has been or will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff to experience frustration, worry, and stress.

88.    As a direct and proximate result of the Data Breach, Plaintiff has been and will continue to be at a substantial and certainly impending risk for fraud and identity theft and its attendant damages for years to come. Such a risk is real and certainly impending, and is not speculative given the highly sensitive nature of the PII and PHI compromised in the Data Breach.

## V.    CLASS ALLEGATIONS

89.    Plaintiff brings this Class Action on behalf of [himself/herself] and all other similarly situated individuals pursuant to Rule 23 of the Federal Rules of Civil Procedure.

90.    Plaintiff seeks to represent a Class of persons to be defined as follows:

> All individuals in the United States whose PII and/or PHI was compromised in the Data Breach of Episoure's systems which occurred on or around January 27, 2025 through February 6, 2025.

91.    Excluded from the Class is Defendant, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

92.    This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when [he/she] moves for class certification as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

93.    **Numerosity:** The members of the Class are so numerous that the joinder of all members is impractical. Plaintiff is informed and believes, and thereon alleges, that there are at least millions of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach, but based on public information, the Class includes approximately 5,418,866 individuals.

94.    **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

> a.    Whether and to what extent Defendant had a duty to protect the PII and PHI of Plaintiff and Class Members;

> b.    Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' PII and PHI, and breached its duties thereby;

c.      Whether Defendant took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII and PHI;

d.      Whether Defendant failed to adequately safeguard Plaintiff's and Class Members' PII and PHI;

e.      Whether Defendant breached its duty to exercise reasonable care in handling Plaintiff's and Class Members' PII and PHI;

f.      Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

g.      Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

h.      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

95.     **Typicality:** Plaintiff's claims are typical of the claims of Class Members. Plaintiff's and Class Members' claims are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and Class Members each had their PII and PHI exposed and/or accessed by an unauthorized third party.

96.     **Adequacy:** Plaintiff is an adequate representative of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the Class Members and has no interests antagonistic to the Class Members. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical, as explained above.

97.     **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all Class Members is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and

provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

98.    **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, are miniscule, in both quality and quantity, compared to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class member suffered damages by that conduct.

99.    **Injunctive Relief:** Defendant has acted and/or refused to act on grounds that generally apply to the Class making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

## VI.    FIRST CAUSE OF ACTION
### NEGLIGENCE
#### (On Behalf of Plaintiff and the Class)

100.    Plaintiff restates and realleges the allegations set forth in paragraphs 1 through 99 above as if fully set forth here.

101.    Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting PII and PHI relating to Plaintiff and the Class in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

102.    Specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendant's security systems to ensure that Plaintiff's and Class Members' PII and PHI in Defendant's possession was adequately secured and protected; (b) implementing processes that would detect a breach of their security systems in a timely manner; (c) timely acting upon warnings and alerts, including those generated by

their own security systems, regarding intrusions to their networks; and (d) maintaining data security measures consistent with industry standards.

103.    Defendant's duty to use reasonable care arose from several sources, including but not limited to those identified below.

104.    Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendant. By receiving, maintaining, and handling PII and PHI that are routinely targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats. Defendant alone controlled its technology, infrastructure, and cybersecurity. It further knew or should have known that if hackers breached its data systems, they would extract sensitive data and inflict injury upon Plaintiff and Class Members. Furthermore, Defendant knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen. Therefore, the Data Breach, and the harm it caused Plaintiff and Class Members, was the foreseeable consequence of Defendant's unsecure, unreasonable data security measures.

105.    Defendant also owed a common law duty because its conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendant's conduct included its failure to adequately restrict access to its computer networks that held Plaintiff's and Class Members' PII and PHI.

106.    Defendant's duty also arose from its position as a business associate. Defendant holds itself out as a trusted business associate, thereby assuming a duty to reasonably protect the information it obtains from its client healthcare providers. Indeed, Defendant, which receives, maintains, and handles the PII and PHI with which it was entrusted, was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

107.   Defendant is subject to an "independent duty," untethered to any contract between Defendant and Plaintiff and Defendant and Class Members. The sources of Defendant's duty are identified above.

108.   Defendant breached the duties owed to Plaintiff and Class Members and thus was negligent. Although the exact methodologies employed by the unauthorized third parties are unknown to Plaintiff at this time, on information and belief, Defendant breached its duties through some combination of the following errors and omissions that allowed the Data Breach to occur: (a) mismanaging its systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards, key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; and (g) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII and PHI.

109.   But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII and PHI would not have been accessed and compromised by cybercriminals.

110.   As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries including:

        a.     Theft of their PII and PHI;

        b.     Costs associated with requesting credit freezes;

        c.     Costs associated with the detection and prevention of identity theft;

d.    Costs associated with purchasing credit monitoring and identity theft protection services;

e.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

f.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

g.    The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII and PHI being placed in the hands of criminals;

h.    Damages to and diminution in value of their PII and PHI entrusted to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others; and,

i.    Continued risk of exposure to hackers and thieves of their PII and PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff and Class Members.

111.   As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## VII.   SECOND CAUSE OF ACTION
### NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

112.   Plaintiff restates and realleges the allegations set forth in paragraphs 1 through 99 above as if fully set forth here.

113.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

by entities such as Defendant or failing to use reasonable measures to protect PII and PHI. Various FTC publications and orders also form the basis of Defendant's duty.

114.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and Class Members' PII and PHI and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII and PHI it obtained and stored and the foreseeable consequences of a data breach involving the PII and PHI it obtained.

115.    Plaintiff and Class Members are within the class of persons that Section 5 of the FTC Act is intended to protect.

116.    Moreover, the harm that has occurred is the type of harm that Section 5 of FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

117.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

118.    Furthermore, Defendant is a business associate under HIPAA, which sets minimum federal standards for privacy and security of PHI. Pursuant to HIPAA, 42 U.S.C. § 1302d, et. seq., and its implementing regulations, Defendant had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiff's and the Class members' electronic PHI.

119.    Specifically, HIPAA required Defendant to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI they create, receive, maintain, or transmit; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, et. seq.

120.    HIPAA also requires Defendant to provide Plaintiff and Class Members with notice of any breach of their individually identifiable PHI "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach." 45 C.F.R. §§ 164.400-414.

121.    Defendant violated HIPAA by actively disclosing Plaintiff's and the Class Members' electronic PHI; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PHI; and by failing to provide Plaintiff and Class Members with notification of the Data Breach without unreasonable delay after its discovery.

122.    Plaintiff and the Class Members are patients within the class of persons HIPAA was intended to protect, as they are patients of Defendant's healthcare clients.

123.    Moreover, the harm that has occurred is the type of harm that the HIPAA was intended to guard against.

124.    Defendant's violation of HIPAA constitutes negligence *per se*.

125.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class Members have suffered injuries, including those identified above in paragraph 119.

126.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## VIII. THIRD COURSE OF ACTION
### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

127.    Plaintiff restates and realleges the allegations set forth in paragraphs 1 through 99 above as if fully set forth here.

128.   Plaintiff and Class Members have an interest, both equitable and legal, in the PII and PHI about them that was conveyed to, collected by, and maintained by Defendant and that was ultimately accessed or compromised in the Data Breach.

129.   Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of monies paid for healthcare services or other services. Defendant's business model would not exist save for the need to ensure the security of Plaintiff's and Class Members' PII in order to provide its services to client healthcare providers.

130.   The relationship between Plaintiff (and the Class Members) and Defendant is not attenuated, as Plaintiff and Class Members had a reasonable expectation that the security of their PII and PHI would be maintained when they provided their PII and PHI to Defendant's client healthcare providers.

131.   Defendant accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. Upon information and belief, this financial benefit was, in part, conferred when Defendant was paid by clients to use Plaintiff's and Class Members' PII and PHI to provide services to Defendant's client healthcare providers. Defendant also benefitted from the receipt of Plaintiff's and Class Members' PII and PHI.

132.   Defendant also understood and appreciated that the PII and PHI pertaining to Plaintiff and Class Members was private and confidential and its value depended upon Defendant maintaining the privacy and confidentiality of the PII and PHI.

133.   But for Defendant's willingness to commit to properly and safely collecting and maintaining the security of Plaintiff's and Class Members' PII and PHI, their sensitive information would not have been transferred to and entrusted to Defendant. Further, if Defendant had disclosed that its data security measures were inadequate, Defendant would not have gained the trust of its client healthcare providers.

134.   As a result of Defendant's wrongful conduct, Plaintiff and Class Members suffered damages in an amount equal to the difference between their payments made with reasonable data security and privacy practices and procedures that Plaintiff and

Class Members paid for, and those payments without reasonable data security and privacy practices and procedures that they received.

135.   Defendant's enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the collection, maintenance, and inadequate security of Plaintiff's and Class Members' PII and PHI, while at the same time failing to securely maintain that information from unauthorized access and compromise.

136.   In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII and PHI. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

137.   Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members. It would be unjust, inequitable, and unconscionable to retain the benefits it received and is still receiving from Plaintiff and Class Members because Defendant failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class Members paid for and that were otherwise mandated by federal and state laws and industry standards.

138.   The benefit conferred upon, received, and enjoyed by Defendant was not conferred gratuitously, and it would be inequitable and unjust for Defendant to retain the benefit.

139.   Plaintiff and Class Members are without an adequate remedy at law.

140.   Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund

the amounts that Plaintiff and Class Members overpaid for Defendant's services, or Defendant should be compelled to place a percentage of all future profits into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, designed to represent the value obtained by the use of the inadequately secured PII and/or PHI compromised as a result of the Data Breach.

## IX.  FOURTH CAUSE OF ACTION
### DECLARATORY JUDGMENT
### (On Behalf of Plaintiff and the Class)

141.   Plaintiff restates and realleges the allegations set forth in paragraphs 1 through 99 above as if fully set forth herein.

142.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et. seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Class Action Complaint.

143.   An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and PHI and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII and PHI. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the compromise of their PII and PHI and remain at imminent risk that further compromises of their PII and/or PHI will occur in the future.

144.   Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that, among other things:

a.    Defendant owed a legal duty to secure patients' PII and PHI under the common law, Section 5 of the FTC Act, and HIPAA; and

b.    Defendant breached and continues to breach this legal duty by failing to employ reasonable measures to secure patients' PII and PHI.

33

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

145.   This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect Plaintiff's and Class Members' PII and PHI.

146.   If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach of any of Defendant's systems. The risk of another such breach is real, immediate, and substantial. If another breach of any of Defendant's systems occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

147.   The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

148.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach of Defendant's systems, thus eliminating the additional injuries that would result to Plaintiff, Class Members, and patients whose confidential information would be further compromised.

## X.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, on individually and on behalf and all others similarly situated, prays for relief as follows:

A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.      For an order finding in favor of Plaintiff and the Class on all counts asserted here;

C.      For compensatory damages on behalf of Plaintiff and the Class;

D.      For punitive damages on behalf of Plaintiff and the Class;

E.      For an order of restitution and all other forms of equitable monetary relief;

F.      Declaratory and injunctive relief as described herein;

G.      For disgorgement and/or restitution as the Court deems appropriate, just, and proper;

H.      Awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

I.      Awarding pre- and post-judgment interest on any amounts awarded;

J.      For reimbursement for all costs and expenses incurred in connection with the prosecution of these claims; and,

K.      Awarding of such other and further relief as may be just and proper.

## XI.     JURY TRIAL DEMANDED

A jury trial is demanded on all claims for which trial by jury is allowed by law.

Dated: July 29, 2025

**LYNCH CARPENTER, LLP**

*/s/ (Eddie) Jae K. Kim*
(Eddie) Jae K. Kim (SBN 236805)
ekim@lcllp.com
117 E Colorado Blvd, Ste 600
Pasadena, CA 91105-3712
Telephone: (213) 723-0707
Facsimile: (858) 313-1850

Karen Hanson Riebel (*pro hac vice* forthcoming)
khriebel@locklaw.com
Kate M. Baxter-Kauf (*pro hac vice* forthcoming)
kmbaxter-kauf@locklaw.com
Jacob E. Lanthier (*pro hac vice* forthcoming)
jelanthier@locklaw.com
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Ave. S, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

Gayle M. Blatt
gmb@cglaw.com
P. Camille Guerra
camille@cglaw.com
**CASEY GERRY FRANCAVILLA BLATT LLP**
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

*Attorneys for Plaintiff and
the Proposed Class*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL